# EXHIBIT 1

SETTLEMENT AGREEMENT

This Settlement Agreement is entered into by and between Defenders of Wildlife and National Wildlife Refuge Association (collectively "Plaintiffs"); North Carolina Department of Transportation ("NCDOT") and Anthony J. Tata in his official capacity as North Carolina Secretary of Transportation (collectively the "NCDOT Parties"); North Carolina Department of Environment and Natural Resources, Division of Coastal Management ("DCM"); Federal Highway Administration ("FHWA") and John F. Sullivan, III, in his official capacity as Division Administrator, FHWA; and Cape Hatteras Electric Membership Corporation. The Plaintiffs, NCDOT Parties, FHWA and Cape Hatteras Electric Membership Corporation are collectively referred to as the Parties.

WHEREAS, the NCDOT proposed the "NC 12 Replacement of Herbert C. Bonner Bridge" (the "Project"), and on December 20, 2010, the FHWA issued a Record of Decision ("ROD") that approved the Selected Alternative (as defined in the ROD) and approved construction of Phase I of the Project ;

WHEREAS, the Plaintiffs challenged the 2010 ROD and related documents in the U.S. District Court for the Eastern District of North Carolina in *Defenders of Wildlife and National Wildlife Refuge Association v. North Carolina Department of Transportation, Eugene A. Conti, Jr., Secretary, North Carolina Department of Transportation, Federal Highway Administration, and John F. Sullivan III, Division Administrator Federal Highway Administration*, Civil No. 2:11-CV-00035-FL (the "Federal Action"), alleging claims under the National Environmental Policy Act ("NEPA") and Section 4(f) of the Department of Transportation Act ("Section 4(f)"). Cape Hatteras Electric Membership Corporation intervened in the Federal Action;

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087

1

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 2 of 33

WHEREAS, the district court entered summary judgment in favor of defendants in the Federal Action, 971 F. Supp. 2d 510 (E.D.N.C. 2013), and Plaintiffs appealed from that decision to the U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit affirmed in part, reversed in part and remanded to the district court, 762 F.3d 374 (4th Cir. 2014), but the mandate has not yet issued;

WHEREAS, Plaintiffs filed a Petition for Contested Case Hearing in the North Carolina Office of Administrative Hearings challenging the September 19, 2012 issuance by the DCM of Coastal Area Management Act ("CAMA") permit 106-12 (the "CAMA permit") in *Defenders of Wildlife and National Wildlife Refuge Association v. North Carolina Department of Environment and Natural Resources, Division of Coastal Management,* 13 EHR 16087 (the "State Action"), and NCDOT intervened in the State Action. The State Action is pending and discovery has been completed;

WHEREAS, all parties to the Federal Action and the State Action believe it is in the best interest of the public, the Parties, and judicial economy to compromise and settle the issues in the Federal Action and the State Action;

NOW, THEREFORE, in consideration of the promises and covenants contained in this Settlement Agreement ("Agreement"), the Parties agree to settle all claims and causes of action arising in or related to the Federal Action and the State Action as follows:

1. NCDOT, DCM and Plaintiffs' Actions and Covenants Prior to Dismissals, and Dismissals:

   a. NCDOT shall rescind the current Phase IIa contract and enter into a contract to provide for interim safe and reliable transportation through the present Phase IIa area (as shown in Exhibit A) while a long-term solution for that area is reevaluated and constructed. Providing for interim safe and reliable transportation through the present Phase IIa area will involve constructing a new temporary bridge located in the existing NCDOT easement, maintaining the present bridge height approximately 15

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT,*
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM,* 13 EHR 16087
2

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 3 of 33

feet above mean high water, lengthening the bridge to no more than 3,000 feet, and using pile bents to support the temporary bridge.

In the event NCDOT determines there is an impairment or immediate threat to safe and reliable transportation through the present Phase IIa area, NCDOT may alter the existing temporary structure; install a detour around this structure; or take such other emergency or temporary measures that are necessary or prudent to assure provisions for interim safe and reliable transportation through the Phase IIa area while a long-term solution is reevaluated and constructed, but shall not include construction of the currently planned and permitted Phase IIa bridge, any other permanent structure, permanent shoreline hardening, or artificially filling in the inlet created by Hurricane Irene. All such interim infrastructure shall be located within the existing NCDOT easement and shall not extend outside the easement unless clearly necessary to provide safe and reliable transportation, and in such case, only to the extent necessary to provide safe and reliable transportation.

b. To provide for interim safe and reliable transportation through the present Phase IIa area, as described in paragraph 1.a., above, NCDOT shall submit an application to further modify the Modifications to CAMA Permit Number 106-12 that are related to Phase IIa, which Modifications were issued April 26, 2013 and October 17, 2013, to authorize the interim measures under paragraph 1.a. while a long-term solution is reevaluated and constructed.

c. NCDOT shall identify Phase IIb Bridge on New Location as its preferred alternative and seek Merger Team Concurrence Point 3 (the terms "Concurrence" and "Concurrence Point" are used throughout this Agreement as described in the Memorandum of Understanding dated May 16, 2012 and its appendices; the Memorandum of Understanding and Appendix B are attached hereto as Exhibit D) on Phase IIb Bridge on New Location Alternative area (as shown in Exhibit B). Nothing in this Agreement requires or should be interpreted to predetermine the choice of the Phase IIb Bridge on New Location as the Selected Alternative.

d. DCM shall expeditiously process any application for CAMA permit modification as described in paragraph 1.b., subject to applicable laws and rules for permit processing, including public comment provisions. DCM shall consult with NCDOT to identify any proposed modifications as described in paragraph 1.b. for Phase IIa which would require permit denial based on the CAMA, the State Dredge and Fill Law or the Coastal Resources Commission's administrative rules. If DCM determines an application for CAMA permit modification as described in paragraph 1.b. for Phase IIa requires permit denial, DCM shall work with NCDOT to expeditiously proceed through the CAMA variance process, including supporting any request to expedite a variance petition if requested by NCDOT.

e. As part of the Merger Team Concurrence Point 3 process, DCM shall provide a written statement of DCM's support and preference for Phase IIb Bridge on New

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087
3

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 4 of 33

Location and by expressing this preference and otherwise shall use best efforts to help NCDOT attempt to secure Merger Team concurrence.

f.   NCDOT shall provide written assurance to Plaintiffs that Phase I as currently planned, designed and contracted does not preclude the addition of a later extension into the Pamlico Sound to the south.

g.   Plaintiffs shall refrain from seeking an injunction against or otherwise impeding the mobilization of work for Phase I while NCDOT is working on completion of the actions set forth in paragraphs 1.a., 1.b., 1.c. and 1.d. above.

h.   Upon rescinding the current Phase IIa contract as set forth in paragraph 1.a and completing the actions set forth in paragraphs 1.b., 1.c., 1.d., 1.e., and 1.f. above, the securing of the CAMA permit modification described in paragraphs 1.b. and 1.d., and the securing of Concurrence Point 3 described in paragraph 1.c., Plaintiffs shall dismiss with prejudice both the federal lawsuit challenging the Record of Decision issued December 20, 2010 and the contested case challenging issuance of the CAMA Permit 106-12 as issued September 19, 2012, and refrain from seeking an injunction against or otherwise impeding the mobilization and implementation of work on Phase I.  Plaintiffs retain the right to challenge future actions and decisions of NCDOT, FHWA and DCM consistent with applicable law and Plaintiffs' covenants and obligations under this Agreement.

i.   Plaintiffs, NCDOT, and DCM will issue a joint press release announcing the settlement immediately following the execution of the Settlement Agreement.

2.   Plaintiffs' covenants and obligations after dismissals:

a.   Plaintiffs covenant not to sue the State of North Carolina (the "State") or the United States including any agency, official or employee as to any claim based on, arising out of or regarding, in whole or in part, the NEPA and Section 4(f) documents issued for the Phase I or the interim Phase IIa work described in paragraphs 1.a. and 1.b., or any permit, approval or any other decision regarding the Phase I or the interim Phase IIa work described in paragraphs 1.a. or 1.b.

b.   If the Phase IIb Bridge on New Location Alternative is determined to be the least environmentally damaging practicable alternative ("LEDPA") and becomes the Selected Alternative, Plaintiffs covenant not to sue the State or the United States including any agency, official or employee as to any claim based on, arising out of or regarding, in whole or in part, the NEPA and Section 4(f) documents issued for the Phase IIb Bridge on New Location Alternative, or any permit, approval or any other decision regarding the Phase IIb Bridge on New Location Alternative.

c.   If the Phase II Extension Alternative (as shown in Exhibit C) is determined to be the LEDPA and becomes the Selected Alternative for Phase IIa, Plaintiffs covenant not to sue the State or the United States including any agency, official or employee as to any claim based on, arising out of or regarding, in whole or in part, the NEPA documents

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087
4

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 5 of 33

issued for the Phase II Extension, or any permit, approval or any other decision regarding the Phase II Extension. Plaintiffs retain the right to challenge any future actions and decisions of the State and the United States related to any Section 4(f) document issued for the Phase II Extension Alternative that they believe fails to comply with federal law or the decision of the United States Court of Appeals for the Fourth Circuit issued in the Federal Action.

    d.  If the Phase II Extension Alternative is determined to be the LEDPA and becomes the Selected Alternative, Plaintiffs will make best efforts to assist NCDOT in obtaining the funding described in paragraph 3.d.viii., below.

3. NCDOT and FHWA covenants and obligations after dismissals

    a.  NCDOT and FHWA shall not design Phase IIa and Phase IIb of the Project so as to preclude the construction of subsequent phases within Pamlico Sound. NCDOT and FHWA acknowledge that the studies to be conducted as part of the NEPA and Section 4(f) processes pursuant to paragraphs 3.c. and 3.d.v. of this Settlement Agreement may conclude that the selected alternative for the studied phase should be located partially or wholly within the Pamlico Sound in order to minimize or avoid the use of Pea Island National Wildlife Refuge, and that such an alternative may be found to be the "least overall harm alternative" (23 C.F.R. § 774.3(c)(1)). NCDOT and FHWA further acknowledge that if a subsequent phase is proposed beyond those described in this Settlement Agreement (Phase IIa and Phase IIb), the environmental studies that are conducted as part of the NEPA and Section 4(f) processes for the subsequent phase(s) may conclude that the subsequent phase(s) should be located partially or wholly within the Pamlico Sound in order to minimize or avoid the use of Pea Island National Wildlife Refuge, and that such an alternative may be found to be the "least overall harm alternative" (23 C.F.R. § 774.3(c)(1)). NCDOT and FHWA acknowledge that all of their obligations must be undertaken in accordance with applicable law, including but not limited to 23 C.F.R. Part 774.

    b.  The Parties agree that Phase I can be implemented immediately after execution of the Settlement Agreement, subject to permitting requirements and other applicable law.

    c.  Phase IIb Bridge on New Location Alternative –

        i.  If the Merger Team concurs that the Phase IIb Bridge on New Location Alternative is the LEDPA for Phase IIb, then NCDOT and FHWA shall promptly revise the December 3, 2013 Section 4(f) evaluation for the B-2500B Project, accompanied by an associated environmental document prepared pursuant to NEPA.

        The revised Section 4(f) and NEPA documents would, without limitation:

            1.  Identify the Phase IIb Bridge on New Location Alternative as the preferred alternative. Nothing in this Agreement requires or should be interpreted to predetermine NCDOT's or FHWA's

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087

5

choice of the Phase IIb Bridge on New Location as the Selected Alternative.

2. Evaluate the potential use of Section 4(f) properties by the Phase IIb Bridge on New Location Alternative.

3. Propose to identify the Phase IIb Bridge on New Location Alternative as the "least overall harm" alternative (23 C.F.R. § 774.3(c)(1)), pending receipt of comments from agencies with jurisdiction over the Section 4(f) properties in the study area.

4. Provide information about the current status of Phase I and Phase IIa activities.

5. Shall not assert the joint planning exception for the Phase IIb Bridge on New Location Alternative in connection with the use of the Pea Island National Wildlife Refuge and shall apply Section 4(f) to the Refuge as both a refuge and an historic property.

6. Be published on the NCDOT's website and mailed in accordance with NCDOT's distribution guidelines and practices. A public hearing would be held and comments would be accepted as required by applicable regulations. All comments received would be considered by NCDOT and FHWA prior to a final decision.

ii. NCDOT shall complete the NEPA, Section 4(f) and the Clean Water Act Section 404 permit processes in consultation with the appropriate State and federal agencies. Upon completion of the NEPA process, NCDOT shall seek a ROD from FHWA.

iii. If the Phase IIb Bridge on New Location Alternative is determined to be the LEDPA for Phase IIb, NCDOT shall provide written assurance that the Phase IIb Bridge on New Location Alternative will be planned, designed, and contracted so as not to preclude the addition of a later extension into the Pamlico Sound to the north.

d. Phase II Extension Alternative – NCDOT and FHWA shall reevaluate the NEPA and Section 4(f) documentation for Phase IIa as outlined in the following steps.

i. NCDOT shall prepare a report on the Phase II Extension Alternative within one and one-half years of the dismissals referred to in paragraph 1.h. The report shall contain information and evaluation sufficient to support Concurrence Points 2 and 2A for the Phase II Extension, and shall inform the analysis necessary for Concurrence Point 3 and for the Section 4(f) evaluation. The report shall, without limitation:

1. Describe the environmental features of the Phase II Extension study area, including performing new studies or updating existing

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*, 11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087

6

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 7 of 33

studies of the topography, coastal condition, wetland and open water habitat, protected species, essential fish habitat, historic properties, and utilities.

2. Identify preliminary corridors that address the Purpose and Need for the project and consider the environmental constraints within the study area, including preparing conceptual/functional designs with horizontal and vertical alignments, edge of pavements, slope stakes, and right of way limits on digital orthophotography, as needed.

3. Include meeting summaries describing recommendations from members of the Merger Team, stating the rationale for retaining or dropping conceptual alternatives. Based on the input from the Merger Team, NCDOT shall identify the alternative(s) to be carried forward for more detailed design (preliminary level design).

4. Describe the development of the preliminary designs and, after coordination with key federal and State agencies, identify environmental impacts and possible measures to minimize such impacts.

5. Provide cost estimates and identify funding alternatives based on the preliminary design.

ii. After completion of the report described in paragraph 3.d.i., NCDOT and FHWA shall consult on the NEPA and Clean Water Act Section 404 permit processes. As part of those processes, NCDOT and the FHWA shall propose that the Phase II Extension Alternative be a detailed study alternative, and shall seek Merger Team Concurrence Point 2 as to the Phase II Extension Alternative.

iii. NCDOT shall use best efforts to identify an alignment that, to the extent possible, avoids and then minimizes harm to submerged aquatic vegetation ("SAVs"), areas of environmental concern ("AECs"), Wildlife Refuge property, historic properties, and other environmental features, consistent with other statutory or regulatory requirements. NCDOT shall use best efforts to secure the Merger Team's Concurrence Point 2A for the Phase II Extension Alternative.

iv. Based on the information gathered in the detailed study of Phase II Extension Alternative and other alternatives, and if: (1) NCDOT and FHWA determine the data support such a recommendation, and (2) such a recommendation is consistent with the requirements of Title 23 of the United States Code and other statutory and regulatory requirements; NCDOT and FHWA shall identify the Phase II Extension Alternative as their preferred alternative, recommend to the

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*, 11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087

7

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 8 of 33

Merger Team that it concur that the Phase II Extension Alternative is the LEDPA, and seek Concurrence Point 3 for the Phase II Extension Alternative.

   v. If the Merger Team concurs at Concurrence Point 3 for the Phase II Extension Alternative during the NEPA and Clean Water Act Section 404 permit processes, NCDOT, in consultation with FHWA shall finalize a NEPA document and Section 4(f) determination. The NEPA document and/or Section 4(f) determination would include without limitation:

       1. Identify the Phase II Extension Alternative as the preferred alternative. Nothing in this Agreement requires or should be interpreted to predetermine the choice of the Phase II Extension Alternative as the Selected Alternative.

       2. Evaluate the potential use of Section 4(f) properties by the Phase II Extension Alternative.

       3. Propose to identify the Phase II Extension Alternative as the "least overall harm" alternative (23 C.F.R. § 774.3(c)(1)), pending receipt of comments from agencies with jurisdiction over the Section 4(f) properties in the study area.

       4. Provide information about the current status of activities on Phases I and IIb.

       5. Shall not assert the joint planning exception for Phase IIa in connection with the use of the Pea Island National Wildlife Refuge and shall apply Section 4(f) to the Refuge as both a refuge and an historic property.

       6. Be published on the NCDOT's website and mailed in accordance with NCDOT's distribution guidelines and practice. A public hearing would be held, and comments would be accepted as required by applicable regulations. All comments received would be considered by NCDOT and FHWA prior to a final decision.

   vi. NCDOT shall complete the NEPA, Section 4(f) and the Clean Water Act Section 404 permit processes for Phase IIa in consultation with the appropriate State and federal agencies. Upon completion of the NEPA process, NCDOT shall seek a ROD from FHWA.

   vii. If the Phase II Extension Alternative is determined to be the LEDPA, NCDOT shall provide written assurance that the Phase II Extension Alternative will be planned, designed, and contracted so as not to preclude the addition of a later extension into the Pamlico Sound to the north.

   viii. If the Merger Team concurs at Concurrence Point 3 for the Phase II Extension Alternative, NCDOT shall make best efforts to obtain funding for it, including, but not limited to GARVEE bonds or other financing.

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087

8

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 9 of 33

e. If at any time during the Merger Team process it appears to NCDOT that there are major issues of concern from members of the Merger Team with regards to moving forward with the Merger Team concurrence process described in this Agreement, NCDOT agrees to allow Plaintiffs and other members of the public to submit information for consideration by the Merger Team that the commenter believes supports the need for and/or the selection of a particular alternative.

f. Upon written request and consistent with state law, NCDOT shall provide or make available to Plaintiffs copies of all public records related to any phase of the B-2500 project submitted by NCDOT to the Merger Team, to any of the agencies participating in the Merger Team, and to any other permitting agency.

4. DCM's covenants and obligations after dismissal:

a. DCM shall facilitate and expedite the alternatives analysis of the Phase II Extension Alternative (if and as requested by NCDOT), including by providing expertise and technical assistance involving the delineation of coastal wetlands and SAV habitat.

b. As part of the Merger Team Concurrence Point 2 process, DCM shall provide a written statement of its support for the study of the Phase II Extension Alternative and use best efforts to help NCDOT secure Merger Team concurrence.

c. DCM shall continue to provide to Plaintiffs' counsel, timely notice of future-issued permits, future-issued modifications, and notice of new permit applications or modification requests for the B-2500 project.

d. DCM shall include a "note" in each subsequent CAMA permit or permit modification for the B-2500 project that states that "the specific development being permitted does not preclude the remainder of the B-2500 project being built in the Pamlico Sound provided that future development will be constructed in a way that avoids and minimizes impacts to AECs."

5. Plaintiffs agree that any judicial challenge to the procedures used or the conclusions drawn by NCDOT, FHWA or DCM for Phase IIa as described in paragraphs 3.d.i.-vi., 4.a.; or Phase IIb as described in paragraph 3.c., shall be brought only after the applicable process is complete and there is a final agency action. The Parties agree that any such challenge shall be brought in a newly filed complaint rather than as a continuation of the Federal Action or State Action.

6. The Parties shall work together to have the Fourth Circuit promptly issue the mandate. Within fourteen (14) days of the Fourth Circuit's entry of the mandate, the Parties will jointly request that the Federal Action and the State Action be stayed for one hundred twenty (120) days, subject to reopening for the dismissals required by paragraph 2.

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087
9

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 10 of 33

7. Each of the provisions of this Agreement shall terminate upon its completion.

8. This Agreement does not affect the exercise of any authority by FHWA, NCDOT or DCM except as expressly set forth herein.

9. In the event of a dispute arising out of or relating to this Agreement, the Party raising the dispute shall provide the other Parties with written notice of the claim as provided in paragraph 10. The written notice shall include a description of the dispute, documentation related to the dispute, and any proposals for resolving the dispute. The Parties agree that they will meet and confer (either telephonically or in person) in a good faith effort to resolve any disputes. The Parties agree to use good faith efforts to schedule an opportunity to meet and confer within thirty (30) days of receipt of the notice of dispute and to resolve the dispute within thirty (30) days thereafter. Nothing in this paragraph is intended to preclude the Parties from engaging in informal communications to attempt to resolve potential disputes. Except for disputes related to the provisions addressed in paragraph 5, if the Parties fail to resolve a dispute, the sole remedy shall be limited to the filing of a new action. The Parties do not waive or limit any defense related to such litigation including that there is no right of action.

10. To the extent any notices are required or authorized under this Agreement, they shall be made in writing by U.S. mail, and addressed to the following:

    a. Plaintiffs:

       Julie Youngman
       Derb Carter
       Southern Environmental Law Center
       601 West Rosemary Street, Suite 220
       Chapel Hill, NC 27516

       Desiree Sorenson-Groves
       Vice President, Government Affairs
       National Wildlife Refuge Association
       1001 Connecticut Ave., NW, Suite 905
       Washington, DC 20036

       Michael Senatore
       Jason Rylander
       Defenders of Wildlife
       1130 17th Street, NW
       Washington, DC 20036-4604

b. State Parties:

North Carolina Dept. of Justice
Transportation Section
1505 Mail Service Center
Raleigh, NC 27699-1505

North Carolina Dept. of Justice
Environmental Division
9001 Mail Service Center
Raleigh, NC 27699-9001

North Carolina Dept. of Transportation
General Counsel's Office
1505 Mail Service Center
Raleigh, NC 27699-1505

North Carolina Dept. of Environment and Natural Resources
General Counsel's Office
1601 Mail Service Center
Raleigh, NC 27699-1601

c. Federal Parties:

U.S. Dept. of Justice
Environment and Natural Resources Div.
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
DJ#90-1-4-13479

Federal Highway Administration
Office of the Chief Counsel
1200 New Jersey Avenue, SE
Washington, DC 20590

d. Intervenor

Cape Hatteras Electric Cooperative
Attn: General Manager
P.O. Box 9
Buxton, NC 27920

Vandeventer Black LLP
Attn: Wyatt Booth, Esq.
P.O. Box 2599
Raleigh, NC 27602-2599

If there is any change in the name or address of the person responsible for receiving notice on behalf of a Party, that Party shall inform each of the other Parties to this Agreement in writing.

11. This Agreement is for the benefit of the Parties only and may not be used by any other person or entity in any other proceeding. This Agreement is binding upon the Plaintiffs and Intervenor and their respective agents, successors and assigns, and is binding upon NCDOT, DCM and FHWA.

12. This Agreement resolves all claims related to or arising from the Federal Action and State Action which have been or could have been asserted except as expressly reserved in paragraph 2.

13. The Agreement is the result of compromise and settlement and sets forth the entire agreement among the Parties. The Agreement does not represent an admission by any party to any fact, claim, or defense concerning any issue in the Federal Action or State Action. The Parties agree the Agreement has no precedential effect.

14. The Agreement may not be modified, altered or changed except by written agreement of all Parties, specifically referring to this Agreement.

15. Whenever possible, each provision of this Settlement Agreement shall be interpreted in such a manner as to be effective and valid.

16. Each Party represents that it has not relied on, and does not rely on, any representations or agreements other than those expressly stated in this Agreement, about any facts or about the nature or extent of any claims, demands, damages or rights it may have against any other Party. Other than those expressly stated in this Agreement, no representations have been made to the Parties to induce them to enter into and execute this Agreement. Each Party expressly agrees it is assuming any and all risks that the facts and law may be or become different from the facts and law as known to, or believed to be, by the Party as of the date of this Agreement. This Agreement supersedes any prior agreements or understandings among the Parties in compromise of the Federal Action and the State Action.

17. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*, 11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087
12

Case 2:11-cv-00035-FL   Document 109-1   Filed 08/11/15   Page 13 of 33

18. The undersigned representatives of the Parties certify that they are fully authorized by the respective Parties whom they represent to enter into the terms and conditions of this Agreement and to legally bind such Parties to it.

19. The terms of the Agreement shall become effective upon the signature of the last Party to approve the Agreement ("Effective Date").


DEFENDERS OF WILDLIFE

By: _____ Dated: 4-30-15

Michael Senatore
Vice President Conservation Law and General Counsel
Defenders of Wildlife


NATIONAL WILDLIFE REFUGE ASSOCIATION

By: _____ Dated:

David Houghton, President
National Wildlife Refuge Association


NORTH CAROLINA DEPARTMENT OF TRANSPORTATION and ANTHONY J. TATA, in his official capacity as SECRETARY, NORTH CAROLINA DEPARTMENT OF TRANSPORTATION

By: _____ Dated:

Anthony J. Tata, Secretary
North Carolina Department of Transportation

By: _____ Dated:

Shelley R. Blake, General Counsel
North Carolina Department of Transportation


NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DIVISION OF COASTAL MANAGEMENT

By: _____ Dated:

Sam M. Hayes, General Counsel
North Carolina Department of Environment and
Natural Resources


4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087
13

Case 2:11-cv-00035-FL    Document 109-1    Filed 08/11/15    Page 14 of 33

18. The undersigned representatives of the Parties certify that they are fully authorized by the respective Parties whom they represent to enter into the terms and conditions of this Agreement and to legally bind such Parties to it.

19. The terms of the Agreement shall become effective upon the signature of the last Party to approve the Agreement ("Effective Date").


DEFENDERS OF WILDLIFE

By: _____ Dated: _____
    Michael Senatore
    Vice President Conservation Law and General Counsel
    Defenders of Wildlife


NATIONAL WILDLIFE REFUGE ASSOCIATION

By: _____ Dated: April 27, 2015
    David Houghton, President
    National Wildlife Refuge Association


NORTH CAROLINA DEPARTMENT OF TRANSPORTATION and ANTHONY J. TATA, in his official capacity as SECRETARY, NORTH CAROLINA DEPARTMENT OF TRANSPORTATION

By: _____ Dated: _____
    Anthony J. Tata, Secretary
    North Carolina Department of Transportation

By: _____ Dated: _____
    Shelley R. Blake, General Counsel
    North Carolina Department of Transportation


NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DIVISION OF COASTAL MANAGEMENT

By: _____ Dated: _____
    Sam M. Hayes, General Counsel
    North Carolina Department of Environment and
    Natural Resources


4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087

13

18. The undersigned representatives of the Parties certify that they are fully authorized by the respective Parties whom they represent to enter into the terms and conditions of this Agreement and to legally bind such Parties to it.

19. The terms of the Agreement shall become effective upon the signature of the last Party to approve the Agreement ("Effective Date").


DEFENDERS OF WILDLIFE

By: _____     Dated:
     Michael Senatore
     Vice President Conservation Law and General Counsel
     Defenders of Wildlife


NATIONAL WILDLIFE REFUGE ASSOCIATION

By: _____     Dated:
     David Houghton, President
     National Wildlife Refuge Association


NORTH CAROLINA DEPARTMENT OF TRANSPORTATION and ANTHONY J. TATA, in his official capacity as SECRETARY, NORTH CAROLINA DEPARTMENT OF TRANSPORTATION

By: _____     Dated: 4/27/2015
     Anthony J. Tata, Secretary
     North Carolina Department of Transportation

By: _____     Dated: 4/27/2015
     Shelley R. Blake, General Counsel
     North Carolina Department of Transportation


NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DIVISION OF COASTAL MANAGEMENT

By: _____     Dated:
     Sam M. Hayes, General Counsel
     North Carolina Department of Environment and
     Natural Resources


4/24/15 Settlement Agr: *Defenders of Wildlife v. NCDOT*,
11-00035 (E.D.N.C.); *Defenders of Wildlife v. DCM*, 13 EHR 16087

13

18. The undersigned representatives of the Parties certify that they are fully authorized by the respective Parties whom they represent to enter into the terms and conditions of this Agreement and to legally bind such Parties to it.

19. The terms of the Agreement shall become effective upon the signature of the last Party to approve the Agreement ("Effective Date").


DEFENDERS OF WILDLIFE

By: _____          Dated:
        Michael Senatore
        Vice President Conservation Law and General Counsel
        Defenders of Wildlife


NATIONAL WILDLIFE REFUGE ASSOCIATION

By: _____          Dated:
        David Houghton, President
        National Wildlife Refuge Association


NORTH CAROLINA DEPARTMENT OF TRANSPORTATION and ANTHONY J. TATA, in his official capacity as SECRETARY, NORTH CAROLINA DEPARTMENT OF TRANSPORTATION

By: _____          Dated:
        Anthony J. Tata, Secretary
        North Carolina Department of Transportation

By: _____          Dated:
        Shelley R. Blake, General Counsel
        North Carolina Department of Transportation


NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DIVISION OF COASTAL MANAGEMENT

By: _____          Dated: 4-27-15
        Sam M. Hayes, General Counsel
        North Carolina Department of Environment and
        Natural Resources

FEDERAL HIGHWAY ADMINISTRATION and JOHN F. SULLIVAN, III, in his
official capacity as DIVISION ADMINISTRATOR, FEDERAL HIGHWAY
ADMINISTRATION

By: _____     Dated: 4/30/2015

John F. Sullivan, III
Division Administrator
Federal Highway Administration


CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION

By: _____     Dated:

Susan Flythe
General Manager
Cape Hatteras Electric Membership Corporation

FEDERAL HIGHWAY ADMINISTRATION and JOHN F. SULLIVAN, III, in his
official capacity as DIVISION ADMINISTRATOR, FEDERAL HIGHWAY
ADMINISTRATION

By:      _____      Dated:

       John F. Sullivan, III
       Division Administrator
       Federal Highway Administration


CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION

By:      _Susan E. Flythe_      Dated:  4/24/15
       Susan Flythe
       General Manager
       Cape Hatteras Electric Membership Corporation



*Aerial date: October 21, 2011*

Pamlico Sound

Pea Island
National Wildlife Refuge

ATLANTIC OCEAN

12

12

n

0    0.25    0.5    0.75 KM

0    0.25    0.5 Mile

—— Phase IIa Area

**PHASE IIa AREA**

Exhibit
A



Pamlico Sound

Pea Island
National Wildlife Refuge

ATLANTIC OCEAN

Refuge Boundary

RODANTHE

Emergency
Ferry Dock

Rodanthe
Historic District

APPROXIMATE SCALE IN MILES
0     0.25     0.50

Aerial date: 2014

═══ Phase IIb Bridge on New Location Alternative Study Corridor

**PHASE IIb BRIDGE ON NEW LOCATION ALTERNATIVE STUDY CORRIDOR**

Exhibit
B



*Aerial date: 2014*

P a m l i c o   S o u n d

A T L A N T I C   O C E A N

Refuge Boundary

APPROXIMATE SCALE IN MILES
0    0.25    0.50

━━━━ Phase IIb Bridge on New Location Alternative Study Corridor
━━━━ Phase II Extension Alternative Study Corridor

**PHASE II EXTENSION ALTERNATIVE STUDY CORRIDOR**

Exhibit
C

# EXHIBIT D

# Memorandum of Understanding

## Section 404 of the Clean Water Act

### And

### National Environmental Policy Act

#### Integration Process for Surface Transportation Projects in North Carolina

**Applicability:**

A. These procedures will generally apply to all new location projects and all projects that require an individual permit under Section 404 of the Clean Water Act. FHWA, USACE, NCDENR, and NCDOT will consult early in the project development process and apply screening criteria to identify specific projects that will follow this process.

Note: If a project is being developed under the North Carolina Environmental Policy Act without FHWA involvement, this process will still be applicable but will be implemented without FHWA participation.

B. Regulatory/Resource Agency participation in this process does not imply endorsement of all aspects of a transportation plan or project. Nothing in these procedures is intended to diminish, modify, or otherwise affect the statutory or regulatory authorities of the agencies involved. In the event of any conflict between this process and other statutes or regulations, the statutes or regulations control.

**Background:**

In a May 1, 1992 agreement, the U. S. Department of Transportation, the Office of the Assistant of the Army (Civil Works), and the U. S. Environmental Protection Agency (EPA) developed policy that would (a) improve interagency coordination and (b) would integrate NEPA and Section 404 procedures. On May 14, 1997, the Wilmington District of the USACE, the North Carolina Division of FHWA and NCDOT signed an Interagency Agreement that provided procedures to integrate NEPA and Section 404 for transportation projects in North Carolina. This integrated approach is part of an effort to streamline the project development and permitting processes. The objective is to ensure that the regulatory requirements of Section 404 of the Clean Water Act are incorporated into the NEPA decision-making process for transportation projects. The original process is hereby modified to incorporate experience gained with

1

years of use of the 1997 agreement, guidance from the USACE-NCDOT-NCDENR permit process improvement workshop, and incorporation of the streamlining provisions of the Transportation Equity Act for the 21st century (TEA-21). This process will continue to be regularly evaluated for its effectiveness and modified as appropriate.

**Concept of Concurrence:**

The process is conducted under the concept of "concurrence" with a project team organization. Concurrence implies that each team member and the agency they represent does not object to decisions made at strategic points in the project development process and in doing so "pledges" to abide by the decision made unless there is a profound changed condition. The USACE, NCDENR, NCDOT and FHWA jointly lead the project team. Concurrence points are defining points in the NEPA project development and Section 404 permitting process. Concurrence is sequential and must be achieved in proper order. As an example, it is not possible to have agreement on alternatives selected for detailed study (Concurrence Point 2) without first achieving agreement on purpose and need (Concurrence Point 1).

Each agency should enter discussion of a concurrence point with a solution oriented attitude. After sufficient discussion and an opportunity for NCDOT to provide requested information, each agency will either concur or non-concur, or, in exceptional cases, abstain.

If an organization decides to either non-concur or abstain, that organization is responsible for documenting its reasons in writing and providing that documentation to all Project Team Members within 5 business days of the Project Team meeting. Primary agencies are responsible for reviewing the reasons for abstaining to determine if the process should move forward. Definitions of concurrence, non-concurrence and abstention are provided below:

- **Concurrence**
    - o "I do not object to the proposed action based on the laws and regulations of my program and agency."
- **Non-concurrence**
    - o "I do not concur as the information is not adequate for this stage and/or concurrence could violate the laws and regulations of my program and agency."
        - ▪ Non-concurrence should not be utilized based on lack of information without affording NCDOT a reasonable opportunity to provide the requested information.
- **Abstention**
    - o "I do not actively object, but I am not signing the concurrence form. The Merger Process may continue, and I agree not to revisit the concurrence point subject to the guidance on revisiting concurrence points".

2

The intent of the streamlined process is to ensure that agency concurrences are obtained before proceeding to the next step or concurrence point. Concurrence will be documented by signature of a concurrence form summary statement. If an agency cannot concur, they agree to provide a written explanation of the basis for non-concurrence to the Project Team. All agencies agree to attempt to resolve issues causing non-concurrence and to try to do this on an informal basis within 15 working days of the subject concurrence meeting.

Having concurred at a particular milestone, a team member will not request to revisit previous concurrence points unless there is substantive new information that warrants a reevaluation. Examples of such a reevaluation might include:

- ➢ a change in the assumptions on which the project purpose or need was based;

- ➢ a change in regulatory authority that extends regulatory jurisdiction to include an area or resource that was not previously regulated;

- ➢ discovery of an impact, resource or additional information that was not previously identified or did not previously exist; or

- ➢ discovery of engineering limitations.

All team members agree that staffing changes are not sufficient reason to revisit a previous concurrence point and that newly involved agency staff will abide by the project decisions made by previous staff and the team. A request to revisit a previous concurrence point will be provided in writing to team leaders and will include supporting documentation. Team leaders (FHWA, USACE, NCDENR, and NCDOT) will respond to the request in writing with a carbon copy, or email with cc's, to the entire Project Team.

**Project Team:**

NCDOT will coordinate with the USACE, FHWA, and NCDENR to identify team members for each project. NCDOT will provide written verification of participating team members for each project. It is recognized that many statutes and regulations must be met in order to achieve concurrence and make good project decisions. Therefore, the following agencies will normally participate unless they decline.

U. S. Army Corps of Engineers
Federal Highway Administration
North Carolina Department of Transportation
U. S. Environmental Protection Agency
U. S. Fish and Wildlife Service
North Carolina DENR, Division of Water Quality
North Carolina Wildlife Resources Commission
North Carolina Department of Cultural Resources

3

The following agencies will be requested to participate when a project is within their respective geographic area:

North Carolina DENR, Division of Coastal Management (within the twenty
                                    coastal counties)
Metropolitan Planning Organizations (MPO's)/Rural Planning Organizations (RPO's)*
National Park Service (in the vicinity of national parklands)
U. S. Coast Guard (Coast Guard permitted bridges)
U. S. Forest Service (in the vicinity of national forest property)
Tennessee Valley Authority (within TVA region)
U. S. Fish and Wildlife Service – Refuge (in the vicinity of federal refuges)
Eastern Band of Cherokee Nation-Tribal Historic Preservation Officer
North Carolina Division of Marine Fisheries and National Oceanic and Atmospheric
Administration (NOAA) (when there is any possibility that resources
                                    under their jurisdiction are in the project
                                    vicinity.  Appendix B provides a list of
                                    Coastal Plain counties where the NOAA and
                                    NCDMF should be contacted to determine
                                    their participation in projects in these
                                    counties.)

*   Each MPO and RPO representative serving on a project team will have authority
    to sign Merger concurrence forms.  The effect of multiple MPO/RPO signatures
    for concurrence will be evaluated 24 months after the date of execution of this
    MOU and recommendations for revisions made as needed.

Each participating agency will develop protocol to determine which office or individual of each agency will participate.  NCDOT's representative on the Project Team will be the Project Development Engineer. To represent NCDOT in all areas of concern related to the natural and human environment, design and safety considerations, a representative from the Human Environment Section, the Natural Environment Section, the Design Engineers (Roadway Design, Hydraulics, Structure, Geotechnical, etc.), Construction Engineers, Transportation Planning and the Division Office should also be invited to attend Project Team meetings to provide technical information and input.  (Each agency will determine whom to invite to the meeting based on project issues.)

**Concurrence Points and Project Phases**

There are seven strategic decision (concurrence) points in the NEPA project development and permitting process:

1.  Purpose and Need and Study Area Defined:  The foundation upon which justification for the project is established.

2.  Detailed Study Alternatives Carried Forward:  Alternatives which satisfy the purpose and need for the project.  These alternatives will be studied and evaluated in sufficient detail to ensure good transportation and permit decision-making.

4

2A. Bridging Decisions and Alignment Review: Identification of bridge and box culvert locations and their approximate lengths and dimensions, and a review of the preliminary alignment for each alternative.

3. LEDPA/Preferred Alternative Selection: The alternative selected as the "least environmentally damaging practicable alternative" or LEDPA (NEPA preferred alternative), through the project development and permitting process.

4A. Avoidance and Minimization: A detailed, interdisciplinary and interagency review to optimize the design and benefits of the project while reducing environmental impacts to both the human and natural environment.

4B. 30 Percent Hydraulic Design Review: A review of the development of the stormwater best management practices and hydraulic design.

4C. Permit Drawings Review: A review of the completed permit drawings after the hydraulic design is complete and prior to permit application.

**Implementation Procedures:**

Attached to this MOU are implementation procedures which provide detailed information that have been developed to provide guidance for the Section 404/ NEPA Merger Process (Merger Process). These implementation procedures have been developed for three basic types of projects as follows:

♦ Process I - Projects on New Location

♦ Process II - Widening and Other Improvement Projects

♦ Process III - Bridge Replacement Projects Processed as a Categorical Exclusion

The guidance for each of these processes consists of a flow chart and detailed guidance on how to complete each step of the flow chart. If there is doubt as to which process to follow, the Project Team will decide which process to use.

*Conflict or Dispute Resolution:*

Concurrence at critical identified points in the project development and permitting process is the key to the success of the Merger Process. However, it is recognized that there may be instances where the Project Team cannot reach concurrence due to diverse agency missions, philosophical differences or policy issues. If the team members of an agency or agencies cannot concur, the approved guidance for conflict or dispute resolution will be initiated. See Appendix C.

5

***Modification:***

Substantive changes to this process will require approval of all primary signatories. Modification may be proposed by one or more signatories. Proposals for modification will be circulated to all signatories for a 30-day review period. Approval of such proposals will be indicated by written acceptance. A signatory may terminate participation in this agreement upon 30-day written notice to all other signatories.

6

*Signatures*:

The four agencies listed below as primary signatories are the process owners of the Merger Process. These agencies are the primary decision-making authority with regard to NEPA and Section 404 permitting and are responsible for conflict or dispute resolution.

The agencies listed as partnering signatories have a significant role as project team members in the Merger Process, and in some cases, may have a statutory compliance role or regulatory function to fulfill. Nearly all of the listed agencies are currently participating as project team members under the existing Merger Process. In addition, many of the listed agencies have participated in developing the Merger Process procedures. By signing this document, these agencies agree to participate and abide by the procedures described in the Merger Process. Such agreement does not compromise or eliminate statutory or regulatory remedies available to the listed agencies (e.g.404(q) or (c)) nor does it circumvent statutory requirements that are mandated to specific agencies. The intent of this agreement is to provide an interactive, predictable process that allows agencies to address their statutory and regulatory requirements **during** the development of transportation projects within the State of North Carolina.

**Primary Signatories:**

_____ COL, EN

Steven A. Baker
Colonel, US Army
District Commander

_____
Date   5/19/12

_____

Eugene A. Conti, Secretary
North Carolina Department of Transportation

_____
Date   5/21/12

_____

John Sullivan, III, Division Administrator
FHWA, North Carolina Division

_____
Date   5/24/12

_____

Dee Freeman, Secretary
North Carolina Department of Environment and Natural Resources

_____
Date   5-25-12

7

# Appendix B:

# Implementation Guidance for Conflict or Dispute Resolution

*NOTE (3-20-08): SAFETEA-LU provides a formal process for resolving serious issues that may delay the project or result in a denial of a required approval for the project. NCDOT or the Governor of North Carolina may invoke the Section 6002 process for issue resolution at any time. While the Section 6002 process is a tool available to States and project sponsors for resolving issues of concern, there are other options that are available to Lead and Participating agencies. Those options include this Implementation Guidance for Conflict or Dispute Resolution, other procedures embodied in a coordination plan, and the CEQ referral process under 40 CFR Part 1504.*

Agreement at critical identified points in project development and permitting is the key to the success of each agency's program. However, it is recognized that there may be instances where a project specific decision cannot be easily reached because of policy conflicts of philosophical differences. This Implementation Guidance is intended to apply to the full spectrum of conflicts and unresolved issues that arise during the development, design, and permitting of North Carolina Department of Transportation (NCDOT) projects. The guidance also provides the specific procedures for elevation to upper management in those cases where the Merger Process concurrence points cannot be reached by the Project Teams. It is understood that every effort will be taken to resolve issues at the Project Team level. In the Merger Process non-concurrence situations, a facilitator should be included in the Project Team discussions. When resolution still cannot be obtained, this elevation process should be initiated.

Any Project Team agency can initiate the elevation process by providing a written request to the NCDOT manager responsible for the project and a copy to the chairperson of the Merger Implementation Team providing the specific reason for the elevation request. NCDOT is responsible for administering the elevation process. Upon receiving the written request, the NCDOT Project Manager will send an e-mail notice of potential elevation to other Review Board members (see attached list for members and addresses) and all Project Team members. The e-mail notification should identify and briefly describe the project involved, the Concurrence Point or issue at which agreement cannot be reached, and the reason for the elevation request. Project Team members are responsible for keeping their respective chain of command informed.

The NCDOT Project Manager will coordinate a tentative Review Board meeting 30 days from the date of the e-mail notice of potential elevation or as soon as possible thereafter. This date will be coordinated with all parties and will be e-mailed to the Review Board, the elevating agency, and all other Project Team members. In advance of the Review Board meeting, the parties in dispute will attempt to resolve the issue by elevating the problem up their respective chains of command to the extent deemed appropriate (e.g. the existing NCDOT/NCDENR elevation process). If resolution is achieved, it will be documented by signing an agreement or the concurrence form and the NCDOT Project Manager will ensure that the Review Board meeting is canceled. In the event that the conflict cannot be resolved by the 21st day of the 30-day time period, the NCDOT Project Manager will ensure the Review Board receives written briefs from the agencies involved to support their respective positions. The NCDOT Project Manager will be responsible for assuring that this information is provided to the Review Board no later than five (5) days prior to the scheduled Review Board meeting.

Executive management and Project Team members from the elevating agency will be invited to present information for the Review Board to consider. All Project Team members may attend.

It is expected that the Review Board will be able to make a decision at the meeting or shortly thereafter. If the Review Board determines that additional information is needed, the decision will be delayed until the information is obtained for the Board's use.

After the Review Board makes a decision, all Project Team members will be given the opportunity to sign the Concurrence Form or an agreement that implements that decision. If a Review Board member represents a non-concurring agency, then the Review Board member has the option to sign the concurrence form for that agency. Concurrence by all Review Board members shall constitute a final decision. Final decisions shall not result in a violation of applicable laws, rules, or regulations.

It is understood that an agency's participation in this dispute resolution process does not preclude other conflict resolution or elevation options available by regulation to that agency. It is also understood that nothing in this agreement diminishes the USACE, Federal Highway Administration, and North Carolina Department of Environment and Natural Resources (NCDENR) roles and responsibilities to make decisions regarding permit requirements, permits, certifications or approvals.

_S. Kenneth Jolly_    _10/15/03_
S. Kenneth Jolly, Chief, Regulatory Division    Date
USACE, Wilmington District

_Dempsey E. Benton_    _10/17/03_
Dempsey E. Benton, Chief Deputy Secretary    Date
North Carolina Department of Environment
and Natural Resources

_Roger E. Sheats, Jr._    _10/20/03_
Roger E. Sheats, Jr., Deputy Secretary    Date
North Carolina Department of Transportation

_Don Voelker_    _10/15/03_
Don Voelker, Assistant Division Administrator    Date
FHWA, North Carolina Division

## REVIEW BOARD MEMBERS FOR ELEVATION PROCESS OF MERGER AGREEMENT

**U.S. Army Corps of Engineers** – Chief, Regulatory Division

**North Carolina Department of Environment and Natural Resources** –Chief Deputy Secretary

**North Carolina Department of Transportation** – Chief Engineer

**Federal Highway Administration** – Assistant Division Administrator

**Chairperson of the Merger Management Team** – NCDOT Director of Preconstruction